Richard D. SKIPPER, Plaintiff-Appellant,

v.

SUPERIOR DAIRIES, INC., a corporation, et al., Defendants-Appellees.

No. 74–1729.

United States Court of Appeals, Fifth Circuit.

May 5, 1975.

Jere D. McWinn, Jacksonville, Fla., for plaintiff-appellant.

Luke G. Galant, Jacksonville, Fla., for defendants-appellees.

Before TUTTLE, COLEMAN and SIMPSON, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal from the judgment of the district court in favor of the corporate and individual defendants after a bench trial following a complaint by Skipper to recover back overtime wages during the entire period of his employment as a route man from December, 1969 to February, 1973. The complaint was filed pursuant to § 16(b) of the Fair Labor Standards Act of 1938 as amended 29 U.S.C. § 201 et seq. The trial court ruled that his employment was such as to exempt him from the protection of the Act under §§ 13(b)(12) (the agricultural exemption) and 13(a)(1) (the outside salesman exemption). The court further found that the plaintiff failed to prove that he worked in excess of 40 hours per week at any time during the period of his employment.

The following brief statement deals with undisputed facts. Richard Skipper was employed at Superior Dairies, Inc. as a route man from November 29, 1969 through June 1973. His claim for overtime pay relates to the period, November 29, 1969 to February 1973. He regularly arrived at the plant on the mornings on which he made deliveries, Mondays, Wednesdays, Fridays and Saturdays at around 4:30 o'clock; he would report to the office to get his load sheet and check his load prior to leaving the plant in Jacksonville, Florida. The truck was refrigerated and it had been loaded after his previous return trip. He went out on his route that extended to Gainesville, Ocala and Silver Springs, Florida where he left dairy products and other products at some 20 or more stores. He arrived back at the plant on Monday, Wednes-

day and Friday late in the afternoon or early evening and "checked up" and loaded for the next delivery, a performance which consumed approximately 45 minutes. On Saturdays he had a helper part of the time and he usually returned earlier.

The route run by the plaintiff was composed, except for two or three small stores, of Mini Mart stores. Superior Dairies products were the only dairy products handled by these stores, an arrangement which had been made by the management and not by Skipper. He kept a book by which he estimated how much milk would be taken each day to build up the supply of each Mini Mart store to its capacity. The milk had to be placed in the window (presumably a glass front refrigerator) in accordance with a picture furnished by the store. Most of the milk was left on the floor. Inside the store his duties included stamping, displaying, rotating and cleaning the milk which he had delivered or was delivering on the current trip. The managers of the stores which he served bought only such products from Superior as were authorized by their home office. Upon completion of his duties in each store the manager signed a ticket and he left. Skipper did not undertake to make sales to new Mini Marts, but he serviced them by leaving Superior Dairies products when instructed to do so by the managers of the plant.

Superior Dairies own no cows. In the words of its president, it is "classified in the industry" as "a packaging and processing plant of dairy products" and further "well, in the trade there is—we're considered as a distributor of milk products." It buys its raw milk from the Upper Florida Milk Producers Association and it cools the milk, separates it, resulting in skim and cream, pasteurizes it, clarifies it, homogenizes it, cultures and churns buttermilk, standardizing it as to contents, packages it in cartons and distributes it to retail outlets for sale.

Superior Dairies also purchased cottage cheese and orange juice which were processed elsewhere, as well as a variety of fruit drinks which were delivered and sold by it to the same customers served by the route man.

The defendants considered Skipper not to be covered by the provisions of the Wage and Hour Law and they thus kept no time records showing his hours of employment. The evidence dealing with the length of the work week will be dealt with later.

## I. THE AGRICULTURAL EXEMPTION.

Neither the trial court nor the appellee in its brief undertakes to answer the contention of the appellant that, regardless of whether Skipper would be an exempt employee because of his work related to "dairying" activity, his admitted delivery and handling of completed processed products from other manufacturers, such as cream cheese, bottled fruit juices, dips and the like, prevented his employer from claiming the exemption based upon his "dairying" activities. As stated, it is without dispute that this company bought completely processed articles which Skipper daily placed on his truck and delivered to the stores on his route as a regular part of his duties for Superior Dairies.

The simplest answer to Superior's claimed exemption here was that given by this Court in Hodgson v. Wittenburg, 464 F.2d 1219 (5th Cir. 1972):

> "The answer to that lies partly in the rule that an employee's performance of both exempt and non-exempt activities during the same work week defeats any exemption that would otherwise apply."

This Court also said in Brennan v. Six Flags Over Georgia Ltd., 474 F.2d 18 (5th Cir. 1973):

> "Nor does it make any difference that the employee is doing mixed work. In any week that any particular employee does some non-exempt work he is covered fully, not pro rata."

Citing *Hodgson, supra,* and Mitchell v. Hunt, 263 F.2d 913 (5th Cir. 1959).

■ Moreover, we conclude that the agricultural exemption does not apply to the activities performed by Skipper relative to his delivery and disposition of the dairy products. It is hardly necessary to invoke the principle that an exemption from this ameliorating statute is to be strictly limited, Phillips v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095, to conclude that under the precise language of the Act no exemption applies to one who plays no part in the actual production of the agricultural product unless such part as is being played takes place "on a farm." The language of the section is as follows:

29 U.S.C. § 203—*Definitions.*

"As used in this chapter— . . .

(f) 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) *performed by a farmer or on a farm* as an incident to or in conjunction with such farming operations, and including preparation for market, delivery to storage or to market or to carriers for transportation to market." [Emphasis added.]

■ The officers of this defendant do not themselves consider that they are in the business of "dairying." They recognize that they are in the business of "a packaging and processing plant of dairy products." The activities that take place with respect to raw milk purchased from producers, place them in the same situation as the rancher and stock man in Hodgson v. Wittenburg, *supra,* who sought to exempt his employees who operated his feed lot and corrals before selling the cattle that were shipped in by others for the purpose of sale.

As discussed in this Court's opinions in Wirtz v. Osceola Farms Co., 372 F.2d 584 (5th Cir. 1967) and as reiterated in Brennan v. Sugar Cane Growers Cooperative of Florida, 486 F.2d 1006 (5th Cir. 1973) the defendants here must prevail, if at all, on the provisions of § 13(b)(12) of the Act[1] as construed in connection with § 3(f) of the Act, Title 29 U.S.C. § 203(f) which is quoted above. In other words, Skipper is an exempt employee only if he is "employed in agriculture" as contemplated by § 3(f), the definition section dealing with agriculture. In both *Osceola* and *Sugar Cane,* this Court stated that this statutory definition of agriculture as construed by the Supreme Court embraces both a primary and secondary concept of agriculture:

"As can be readily seen this definition has two distinct branches. First, there is the primary meaning. Agriculture includes farming in all its branches. Certain specific practices such as cultivation and tillage of the soil, dairying, etc., are listed as being included in this primary meaning. Second, there is the broader meaning. Agriculture is defined to include things other than farming as so illustrated. It includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidently (sic) to or in conjunction with 'such' farming operations." Farmers Reservoir & Irrigation Co. v. McComb, 1948, 337 U.S. 755, 762–763, 69 S.Ct. 1274, 1278, 93 L.Ed. 1672, 1680.

It is clear that if Skipper was "employed in agriculture," it would be only under the secondary meaning of the section. To ask whether Skipper, in picking up from Superior Dairies, a company that buys its raw milk from the original

---

1. Title 29 U.S.C. § 213(b)(12) provides:

"The provisions of this section shall not apply with respect to . . . . .

(12) Any employee employed in agriculture . . . . .

farmers, and located nowhere near a farm, and delivering products to the stores on his route was performing acts "either by a farmer or on a farm" is, it seems to us, to answer the question. The outer limits of activities that might be said to qualify under this secondary meaning would, it seems to us, be those involved in the *Sugar Cane* case, *supra*. There the Sugar Cane company had its mill complex in the middle of an area occupied by sugar farms or plantations. The company furnished employees who actually harvested the sugar cane, being transported to and from their work daily. The question was whether the cooks and attendants working at the barracks and appurtenant facilities used by the workers were exempt. This Court held that under the circumstances there existing this was work which was done "on a farm" for purposes of the agricultural exemption. The court there said:

"It would not be physically possible for Sugar Cane to place its labor camps right in the middle of the cane fields. Sugar Cane does not claim an agricultural exemption for workers whose efforts are confined to a processing mill at some remote location. These employees, rather, perform their work at a location in close proximity to the fields worked by the laborers for whom they cook and clean."

The court then stated:

"We hold, consequently, that because of the unique facts of this case, the question of whether the work of the camp cooks and attendants was done 'on a farm' should be resolved against the Secretary. A labor camp housing 375 men is 'on a farm' in the only sense it can be if it is in fact adjacent to and near the farmland being harvested."

We conclude therefore that the agricultural exemption did not cover the activities of Superior Dairies and thus Skipper was not "employed in agriculture" within the contemplation of § 13(b)(12) of the Act.

## II. THE OUTSIDE SALESMAN EXEMPTION.

The trial court found that Skipper's services were not covered by the Wage and Hour Law because of the provisions of § 13(a) of the Act which provides as follows:

"§ 13(a) The provisions of sections 6 and 7 shall not apply with respect to (1) any employee employed . . . in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of the Administrative Procedure Act . . .)."

The trial court, without discussing any of the regulations which the statute expressly makes a part of the law, seemed impressed with the value of the exemption to a company that employs drivers to deliver its products on an established given route. In arriving at its findings of fact, the trial court overlooked completely the basic fact that Skipper's testimony was undisputed to the extent that he did no selling, in the sense that he had no face-to-face negotiation with a store owner or manager who was in the position of purchasing or ordering the products which Skipper was delivering. The evidence was not in dispute that in all convenience store operations, (and these were almost exclusively what Skipper was engaged in supplying) the right to place the product in each individual store, whether it was called Dixie Mini, U–Pak, Jax Mini or Lil' Champ, all of which are owned by the Mini Mart Company, was obtained by negotiation between the management officials of Superior Dairies and officials of Mini Mart. Superior then authorized Skipper to serve the individual unit. There is no dispute to the testimony that all Skipper carried on his truck was his estimate of the amount, in individual sizes, of each item which he thought would be needed to bring the supply previously left with the individual store back to an equal amount on each trip. The trial court commented on the fact that nobody but

Skipper decided how much he would take on his truck each day. This, of course, was true, because Skipper kept the list of the amount that was supplied to each unit, and he was able to estimate how many items it would take to restock each place. The testimony was undisputed that he made no effort to increase the amount of his deliveries to a unit over the amount that had previously been dropped. He accepted whatever space limitations were available as determined by the manager of each store, commenting that it would have done no good to sell additional amounts than what were being sold, because dairy products were perishable and it would merely have meant that they would have been wasted.

The trial court commented upon the fact that Skipper's "sales" had dropped during the period of his employment from a point where he at one time made in excess of $300 a week to a point where he sometimes got less than $200 a week. The court concluded that the failure of the plaintiff to maintain a higher income was due to his lack of desire to sell. While we do not normally make the inferences that are part of the normal fact finding of a trial court, it would appear much more likely that the fact that Skipper permitted his weekly earnings to drop so drastically would indicate that he was doing what he said he was supposed to do—that is, merely deliver daily supplies to designated stores, rather than going out on a route on his own and undertaking to build up new customers for his dairy products. His failure to maintain earlier earnings would, it seems to us, be much more likely an indication that the management of other dairies were being more successful in keeping their products in the several units of convenience stores than was the management of Superior Dairies.

In an indication of how this selling was actually done, Superior's route manager, Hewlett, testified as follows:

"A: I have been with Mr. Sklaff to solicit.

Q: Convenience stores?

A: Well, you would call them convenience type stores.

Q: On those occasions, describe to the court what occurred.

A: We would go in and tell the price of our merchandise and what it would cost them and what their deliveries would be.

Q: Was this a new convenience store that had just opened up or what?

A: It was sometimes new or sometimes one that had been in business.

Q: All right.

A: I mean we serve anybody that would let us serve them.

Q: All right. Well, if you—if a new convenience store opened up in your territory when you were route manager, what would you do about it, if anything?

A: If possible go see them. If not, Mr. Skipper would drop by. He had the same knowledge we had on what we could do for the customer.

Q: What would it take to get Superior Dairies products into that store?

A: Salesmanship.

Q: Well, I realize that.

A: Quality.

Q: But at what level and who made the decision on the part of the convenience store?

A: The customer always made the decision. We was always willing.

Q: Did the store manager there have the authority to grant your request and say "yes, I'll take your product?"

A: Well when you're talking about convenience stores are you talking about chain-type convenience stores or independent convenience stores?

Q: Chain-type convenience stores.

A: Most of those chain-types were made in the office, home office at whichever company owned the

chain. *The managers were not at will to say who they would buy from.* [Emphasis added.]

Q: So what would it take to get your products into a store like that?

A: It would take Mr. Skipper to give them the chain and they would go see who owned the chain.

Q: Who would go see the chain?

A: One of—Mr. Sklaff or myself or somebody in this capacity.

Q: You would go to the home office of the chain?

A: If necessary.

Q: Well what other way could you do it, just phone or something?

A: Well you could.

Q: Well how was your customary way to do it?

A: To go to the home office.

Q: And this would take a person such as yourself or Mr. Sklaff?

A: True."

Superior Dairies introduced at the trial delivery sheets for the month of August through December, 1972 covering the route of the plaintiff, Skipper. At the request of Superior's counsel, Mr. Skipper identified these as typical and illustrative of all of the delivery sheets for the period he worked with the defendant. It is significant that not a single entry appears on any of these 73 separate delivery sheets of a delivery to any store other than those which were identified as being owned by Mini Mart. Thus, at least, for this period of time, it would appear that not a single sale was made by the route man.

We consider that this case is quite similar to the case of Hodgson v. Klages Coal and Ice Co., 435 F.2d 377 (6th Cir. 1970). The facts as stated by the court in *Hodgson* were as follows:

"So much of the facts as may be stated to be undisputed are as follows. Initially, in a newly opened retail store or in a new account, the store manager must receive permission from the chain's central office in order to carry appellant's products. Permission takes the form of an authorization letter from the central office to the store manager. In the case of a newly opened store, appellee's route manager or sales manager would contact the chain's central office to solicit the authorization letter for the store. This same procedure seems to be followed in the case of placing new products in established outlets. The authorization letter does not obligate the store manager to buy any goods. Once authorized, the store manager must decide whether he desires to carry the authorized products, and if so, he must allocate the shelf space to be stocked with the new products. He must also contact the appellee's management, which will then assign the store to a route.

Once the product is established, the routemen's function inside the store ordinarily is to survey the shelves allocated to his products, determine how many cases would be needed to refill them, and then restock the shelves accordingly from the stock carried on his truck. In some cases the routeman loads the shelves himself, in others he leaves the stock in the aisles to be shelved by the store's employees. The routeman would then prepare an invoice for the stock delivered and receive payment. In addition, the routeman must sort and crate the empties returned to the store for deposit. Most routemen of some experience seem to have a good idea of how much stock will be needed for the calls of a particular day and would make up an order for the stock to be placed on his truck by other employees the preceding night. He would also carry an extra supply of beverage for any special promotional displays he hoped to place in a store. The placement of additional stock for promotions connected to appellee's advertising was also handled on the basis of an authorization by the store's central office and often depended on the volume of sales of the product and the availability of additional space."

The court carefully considered the provisions of the regulations found in 29

C.F.R. § 541.500 et seq., especially § 541.-505.[2]

It seems to us that the provisions of sub-paragraph (c) of this regulation clearly cover the activities of the driver in the case before us. This sub-paragraph provides:

"One source of difficulty to determining the extent to which a route driver may actually be engaged in 'making sales' arises from the fact that such a driver often calls on established customers day after day or week after week, delivering a quantity of his employer's products at each call. Plainly, such a driver is not 'making sales' when he delivers orders to customers to whom he did not make the initial sale in amounts which are exactly or approximately prearranged by customer or contractual arrangement or in amounts specified by the customer and not significantly affected by solicitations of the customer by the delivering driver. Making such deliveries, as well as recurring deliveries the amounts of which are determined by the volume of sales by the customer since the previous delivery rather than by any sales effort of the driver, do not qualify the driver as an outside salesman nor are such deliveries and the work incident thereto directed to the making or soliciting of sales by the driver so as to be considered exempt work."

Certainly for the period covered by the delivery sheets introduced in evidence (the only ones relied upon by the defendant) those delivery sheets show that the entire activity of Skipper constituted in his delivery of products furnished by Superior Dairies to predetermined customers in amounts "which are exactly or approximately prearranged by customer or contractual arrangement or in amounts specified by the customer and not significantly affected by solicitations of the customer by the delivering driver." 29 C.F.R. § 541.505(c), supra. We must take as correct the concession exacted from Skipper by counsel for Superior Dairies in cross-examination that these sheets for this period of time exemplified the course of dealings for the entire period.

We conclude that Skipper's employment was not exempt on the theory that he was an "outside salesman."

### III.  HOURS WORKED.

The measure of the plaintiff's right with respect to overtime payment depends, of course, upon the number of hours worked per week. Here it is undisputed that Skipper's normal work week was Monday, Wednesday and Friday, with a somewhat shorter run on

2.  This regulation provides as follows:

"Where drivers who deliver to an employer's customers the products distributed by the employer also perform functions concerned with the selling of such products, and questions arise as to whether such an employee is employed in the capacity of outside salesman, all the facts bearing on the content of the job as a whole must be scrutinized to determine whether such an employee is really employed for the purpose of making sales rather than for the service and delivery duties which he performs and, if so, whether he is customarily and regularly engaged in making sales and his performance of nonexempt work is sufficiently limited to come within the tolerance permitted by § 541.5. The employee may qualify as an employee employed in the capacity of outside salesman if, and only if, the facts clearly indicate that he is employed for the purpose of making sales and that he is customarily and regularly engaged in such activity within the meaning of the Act and this part. As in the case of outside salemen whose jobs do not involve delivery of products to customers, the employee's chief duty or primary function must be the making of sales or the taking of orders if he is to qualify under the definition of § 541.5. He must be a salesman by occupation. If he is, all work that he performs which is actually incidental to and in conjunction with his own sales effort is exempt work. All other work of such an employee is nonexempt work. A determination of an employee's chief duty or primary function must be made in terms of the basic character of the job as a whole. All of the duties performed by an employee must be considered. The time devoted to the various duties is an important, but not necessarily controlling, element."

Saturday. It is undisputed that during the last nine months of his employment, the Saturday run was shortened by reason of the fact that Skipper did not go beyond the City of Gainesville, and under those circumstances he conceded that he may have been back at the plant by noon. It is equally undisputed that for the remaining time of his employment, approximately two years, the Saturday run was longer.

The plaintiff contended that he arrived at the plant at approximately 4:30 a. m. each day; that he thereupon checked his truck and his load and checked out of the plant by approximately 5:00. He contended that he did not stop for breakfast more than once every couple of weeks and that he stopped as long as ten minutes to pick up a hamburger for lunch which he ate on the route. He claims that he returned to the plant about 8:30 and that then took him some 45 minutes to check out, make his report and load his truck for the next trip. This would amount to 16 hours and 35 minutes on Mondays, Wednesdays and Fridays. He said he worked about 12 hours on Saturday until the last nine months of his service at which time he went only to Gainesville, and got back to the plant by 12:00. This would have been eight and a quarter hour day (4:30 a. m. to 12:00 plus 45 minutes for check-out). This would have amounted to a weekly stint of 61.5 hours per week for all but the last nine months and 57 and three-quarters hours for that period.

Testifying on behalf of the plaintiff, Preston Hewlett, who was a high school youth who worked during the first eight months of Mr. Skipper's employment, worked regularly only on Saturdays. He occasionally helped out on a week day if he could get out of school. He recalled that they left the plant at 5:00 a. m. ate breakfast in Gainesville, which took 30 minutes, and returned at 4:00 p. m. This testimony, of course, does not throw any light upon Skipper's hours of work on Monday, Wednesday and Friday when he had no helper. All witnesses testified that when he had a helper, the trip took less time. Hewlett's testimony would support a finding that the work day on Saturdays was from 5:00 a. m. to 4:00 p. m. with 30 minutes out for breakfast and ten minutes to pick up lunch "to go." This would amount to ten hours and 20 minutes, to which must be added 30 minutes for loading and 45 minutes for unloading, or a total of 11 hours and 35 minutes for a Saturday run with a helper. There is no evidence that Skipper had a helper except for the eight months during which young Hewlett worked for him.

Mitchell Sklaff, president of the company, and himself a defendant, and whose testimony, therefore, might normally be treated as binding on the defendant, testified that he did not know when Skipper left, but he saw him return at "5:00, 6:00, or 4:00" o'clock. Although it might well be proper for the trier of facts to take the figure most strongly against the interest of the declarant, or 6:00, it certainly would not be improper for us to conclude that the trial court must have accepted at least the median figure of 5:00 p. m. as the time he testified Skipper returned from his daily run. This would account for 12 hours plus one and a quarter hours for preparing in the morning and checking out in the evening, less ten minutes for lunch, or 13 hours and five minutes a day. He testified that Skipper returned at 12:00 on Saturday.[3] 5:00 a. m. to

3. "A: The only day being different would be Saturday. Now, I am not familiar with the route man that much but on Saturday, I run a cooler inventory and Mr. Skipper would normally come in on Saturday; I would have my inventory run. Now, I don't know whether his route changed or anything of this nature. I don't know how his route was run or how many stops he had or where they were at.

Q: What time would that be on Saturday?
A: This would be around noon on Saturday.
Q: Was that normally true every Saturday?
A: Every Saturday."

noon is seven hours, to which must be added one and quarter hours less ten minutes to pick up lunch to be eaten on the go. This would be a work week of $13 \times 3 = 39$ plus eight hours and five minutes or 47 hours and five minutes. It must be borne in mind that these are figures testified to by the president of the defendant corporation and himself a defendant, except for the time for checking out in the morning and loading and checking in in the afternoon.

Charles Sklaff, vice president of the company, and also a defendant, was not able to testify as to the time Skipper left the plant in the morning. He testified that when he was at the plant in the afternoons he normally saw Skipper at 5:00 p. m. This would account for a 13 hour day, with the same allowances for checking in and out, and fifteen minutes for the hamburger stop. He did not testify as to when Skipper returned on Saturday, but assuming the correctness of Mitchell Sklaff's testimony, just recited, this would account for eight hours or a work week of 47 hours.

Albert Sklaff, chairman of the board, and also a defendant, was not at the plant in the morning, and was thus unable to testify as to the time Skipper left. As to the time of return he testified:

> "His averages was Monday, Wednesday, and Friday, I'd say between 5:00 and 6:00 average. Saturday was 11:00 most of the time."

Once again, while it would be entirely appropriate for the finder of facts to take the 6:00 hour as being binding on the adverse witness, a party to the litigation, we assume instead an average return time of 5:30. This would account for a week-day run of 12½ hours, to which is to be added one and a quarter hours for checking out in the morning and loading and checking in in the afternoon, for a total of 13½ after deducting

fifteen minutes for picking up a hamburger "to go." Accepting Albert's figure of a Saturday return at 11:00 a. m. instead of Mitchell's testimony of 12:00, this would amount to a Saturday total of seven and a quarter hours, including check-in and check-out time. This would amount to a total work week of 46½ hours.[4]

The only possibly conflicting testimony as to the time Skipper left the plant in the morning, which he said was normally 5:00, was the testimony of Louis Hewlett, a disinterested witness who had formerly been state supervisor and before that a supervisor at the Superior Dairy plant. When asked as to the time Skipper left in the mornings Hewlett said: "The mornings that I was there, he would leave 5:00 or 6:00. Some mornings he would leave at 7:00 or 8:00, depending on if he overslept or whatever." He then testified as follows:

> "Q: All right, how about in the evening, what time did he come in in the evening?
>
> A: Anywhere from 4:00 to 6:00."

On cross-examination Mr. Hewlett testified that he worked throughout the state for the dairies for a substantial part of the time that Skipper worked the route. Finally, the following colloquy took place:

> "Q: How many days would you normally be out there in the morning?
>
> A: Some weeks, I was out there every day. Some weeks I wasn't out there at all."

He also stated that if he was in town he was at the plant until every man had left.

There is also the testimony of a former route supervisor, Fernandez, who occasionally took Skipper's route if he was ill. He was asked: "When you were not running that route, did you have oc-

---

4. Since the only testimony in conflict with Skipper's statement that he did not stop for breakfast is that of his helper who worked for him on Saturdays, there is no evidence to support the deduction of a half hour from any of the work weeks subsequent to the first eight months for a stop for breakfast which occurred on Saturdays when young Hewlett was working.

casion to see Mr. Skipper when he left on that route in the mornings?

"A: Yes, sir, I have seen him when he left on it and when he comes in.

Q: About what time would he normally leave?

A: Well, normally, if he got up on time he *should* leave around 5:30, but he has left as late as 8:30 or 9:00. [Emphasis added.]

Q: What was the cause of that if you know?

A: I don't know. I assume he overslept."

On this record, in which all three officers of the defendant company, all of whom were themselves defendants to the litigation, testified that Skipper's return to the plant was at an average time of 5:00 p. m., and where there is no substantial evidence to contradict the testimony of Skipper and Preston Hewlett that the starting time for the run was approximately 5:00 a. m., following a preparatory period, it is unimportant that two witnesses testified that they had actually made the run which they described as being similar or identical to that run part of the time by Skipper at times varying from eight to twelve hours. This has little bearing on the case.

The employee is entitled to compensation for hours actually worked by him. If another employee could or did perform the same duties in less time, a trier of the facts could, of course, conclude that such person was a faster worker than the complaining employee. Such fact would not detract from the binding effect of the testimony of the owners of the business and the testimony of the employee which established a longer day of work. Even if the trial court were to accept as true Louis Hewlett's testimony that he saw Skipper leave as late as 5:30 often enough to make a specific finding to that effect, this would reduce the work week by two hours, which would still leave a minimum of between 44 and 45 hours per week.

Finally, a simple glance at the 73 different delivery lists introduced in evidence, showing the items to be loaded, checked, carried and delivered, makes plain that there is no reason to disbelieve the unimpeached testimony of Skipper and his assistant as to the time consumed in checking in in the morning and loading the truck and in checking out after the deliveries in the afternoon. And, again, however, if the trial court had considered these services at all, which is not apparent, and had reduced the claimed time by as much as half an hour a day, the absolutely undisputed evidence would require a finding that the average work week exceeded 40 hours by two to three hours. This is not de minimis in light of the length of time involved and the requirements of the statute that any underpayments found to be due would be doubled.

The standard of review in a wage and hour case of this kind, where the employer fails to keep accurate records is well established in this Circuit. In *Mitchell v. Mitchell Truck Line, Inc.,* 286 F.2d 721, this Court quoted from *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) as stating the rule where "work not compensated for is performed, but the employer's records are inaccurate or inadequate." The Supreme Court said:

"The solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a

matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may be only approximate. . . ." 328 U.S. at pp. 687, 688, 66 S.Ct. at p. 1192.

The burden which shifts to the employer when no record is kept of the actual number of hours worked, as is the case here, was dealt with in this Court's opinion in Shultz v. Hinojosa d/b/a H & H Meat Products Co., 432 F.2d 259 (5th Cir. 1970). In that case this Court set forth the rule that when the employer fails to keep time records, he must "disprove" the employee's testimony that the Act was violated. Here the Court held that the preponderance of the evidence was in favor of the defendants as to the finding which it made to the effect that "plaintiff's average work week was 40 hours per week or less and that insufficient proof exists in favor of plaintiff, that he worked over 40 hours in any one week during the period material to this case." [5]

■■ As stated, the *Hinojosa* case establishes the proposition that where records are not kept, the employer has to "disprove" the evidence adduced on behalf of the employee. The appellant here contends that the trial court used the wrong standard of proof, in that the court weighed the evidence pro and con. While the standard of proof should be somewhat different where an employer takes his chances with being in compliance and thus not keeping the wage and

hour records of employees which he contends are exempt than in other types of litigation, we think this difference is that the burden of proof shifts to the employer. The trial court found that the employer carried that burden. It determined that the preponderance of the evidence was with the employer. However, we are firmly convinced that, in light of the testimony of the defendants themselves, the holding by the trial court that the evidence as to the 40 hour or less work week preponderated in favor of the employer is clearly erroneous.

We have dealt to an unusual extent with the facts in this case, because it is a fact case. In doing so, we have dealt only with the undisputed testimony of the plaintiff on the one side and something less than the most damaging testimony given *by the defendants themselves* on the other.

The judgment is therefore reversed and the case is remanded for further proceedings not inconsistent with this opinion.

---

**5.** While there is no de minimis rule with respect to wage and hour compensation, we are reluctant to refer to a single instance of clear evidence of what appears to be a failure to pay for overtime. Among the 73 different delivery sheets actually introduced in evidence there is a group of one week's sheets showing *five* instead of four trips by Skipper. This included a regular trip on Thursday, December 21, a regular trip on Friday, December 22, each of which covered the full number of stops, a short trip (apparently to Gainesville) on Saturday, the 23rd, a short trip on *Sunday,* December 24, and a regular trip on Tuesday, December 26. Moreover, Skipper testified that regularly on Christmas Eve he had run an extra trip.