# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 18, 2013

Lyle W. Cayce
Clerk

No. 12-10785

FLORENTINO MEZA, and all others similarly situated under 29 U.S.C. 216(b),

Plaintiff–Appellant

v.

INTELLIGENT MEXICAN MARKETING, INCORPORATED; DAVID BENITEZ; RICARDO J. VILLARREAL,

Defendants–Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before DeMOSS, DENNIS, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Plaintiff–Appellant Florentino Meza appeals the district court's grant of summary judgment for his former employer, Defendant–Appellee Intelligent Mexican Marketing, Inc. ("IMM"). Meza claims he is entitled to minimum-wage and overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). IMM claims he falls within the FLSA's exemption for outside salesmen, and the statute's overtime and minimum-wage requirements do not apply to him. Because the record indicates that Meza spent the vast majority of his time selling goods or performing work incidental to his sales, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

From June 2010 until July 2011, Meza was employed as a route salesman at IMM, a company that sells and delivers food and beverage items to convenience stores. Before he began his employment at IMM, Meza was a self-employed water purification system salesman. Meza had obtained his position at IMM after he heard the company was hiring salesmen, and he took the job with the understanding that he would be doing marketing and sales work for the company. When he began working, IMM trained Meza for his new position by having him shadow an experienced salesman for a month.

Meza was paid a weekly salary of $300, plus commissions that varied by product. He was also entitled to a bonus of $75 if his sales in one week reached $6,500, or a bonus of $175 if they reached $7,500. Meza averaged $164 a week in commissions in 2010, and $233 a week in 2011. Initially, Meza was told he would be paid for each new customer he brought in who ultimately bought more than $115 worth of product, though Meza claims this incentive system was eliminated after a few months.

In his capacity as a route salesman, Meza would arrive in the morning at an IMM warehouse and switch from his own car to a company truck he had loaded with goods the evening before. He would drive to between seventeen and twenty-two convenience stores or supermarkets daily, following a route specified by a supervisor and designed to minimize fuel use. At each stop on his route, Meza would greet the store attendant, inspect any IMM-distributed goods on the shelves, remove those that were past or close to their expiration date, and make a list of goods that needed to be restocked on his handheld computer. Meza would arrange the goods to conform with photographs IMM provided its route salesmen showing the preferred arrangement of the company's goods on a store's shelves. If a store did not carry a particular IMM-distributed product, Meza would try to sell it by pointing out that it had sold well in other stores, or by

No. 12-10785

giving the attendant or cashier a sample.  Meza would also try to improve the placement of certain goods—for example, he would sometimes negotiate for space near the cash register where "impulse merchandise" was sold.  The attendant would check Meza's list of goods to be purchased or restocked, and approve or reject the order.  The cost of any unsold expired goods was debited from Meza's sales.  Meza would then return to his truck to retrieve the ordered goods and bring them into the store.  The attendant would check the order and pay with cash or on credit.  Meza would then leave for his next stop.

Unlike employees like route salesmen, IMM supervisors were not permitted to make regular sales, but they could negotiate special price reductions with specific stores.  Meza would sometimes deliver goods that had been ordered following a promotion arranged and negotiated by an IMM supervisor.

Meza was also authorized to visit stores that did not yet carry any of IMM's products to try to develop new business.  At these stops, Meza would introduce himself and present photographs or samples of the products he was selling.  Any sales were recorded using Meza's handheld computer.  Meza successfully recruited a number of new customers, including one shortly before the end of his employment at IMM.

At the end of the day, Meza would return to the IMM warehouse.  On the way there, he would buy a money order with the cash he had received from his customers and fill the truck he was driving with gas.  Once at the warehouse, Meza would record his arrival and wait in a line of other trucks to be able to reload his truck with goods.  When he reached the front of the line, Meza would review his orders with the warehouse workers, and they would provide the

No. 12-10785

required products. Meza would then load the goods into the truck himself, which usually took about forty minutes. Then he would close the truck and return the handheld computer before leaving for the evening.

Meza would typically work six days a week, reporting each day to IMM's warehouse at 6:30 a.m., returning to the warehouse by 5:00 p.m., and leaving the warehouse around 7:00 p.m. He would take lunch breaks, which he was not required to record, that usually lasted about twenty minutes. This meant that Meza worked about seventy-two hours per week, at an average wage of $6.66 an hour.

Meza claims he had only twenty minutes at each stop on his route to perform his duties, leaving him little time to deliver meaningful sales pitches. Because he was only able to visit twelve or thirteen stores a day, Meza would not always be able to visit all the stores on his assigned route, which would sometimes include as many as twenty-two separate stops. However, Meza was able to visit most stores at least once a week.

IMM route salesmen were expected to attend weekly hour-long sales training meetings, though IMM did not provide its route salesmen opportunities to attend sales conferences. At the sales training meetings, managers would announce sales contests, explain sales strategies, and tell the salesmen about any products IMM was promoting.

IMM also employs warehouse drivers, whose duties include delivering goods to customers. Warehouse drivers do not receive sales commissions, and are subject to the FLSA's minimum-wage and overtime pay requirements. There is no evidence in the record that IMM employs any salespeople other than its route salesmen.

4

No. 12-10785

On July 13, 2011, Meza filed this suit against IMM and its owners,[1] seeking damages stemming from IMM's alleged statutory minimum-wage and overtime violations.[2] Reasoning from the premise that he had worked fifty-five weeks for IMM, Meza calculated that he was owed $3,080 in unpaid minimum-wage compensation, and $15,224 in unpaid overtime compensation. On July 28, 2011, shortly after Meza initiated this suit, he was terminated by IMM.[3]

On December 19, 2011, largely on the basis of Meza's testimony at his deposition, IMM moved for summary judgment, arguing that the FLSA's provisions did not apply to Meza because he was an outside salesman. The district court determined that Meza was indeed properly categorized as an outside salesman, and granted summary judgment for IMM. Meza timely appealed.

---

[1] Defendants–Appellees David Benitez and Ricardo Villarreal have ownership interests in IMM. Meza's claims against them are indistinguishable from those he has brought against IMM, and we therefore dispose of the claims against all three parties together. "IMM" thus refers to all Defendants–Appellees still party to the suit. Ana Trevino, who also has an ownership interest in IMM, was once a named Defendant but was dismissed from the suit by the parties' joint stipulation before the summary judgment order issued.

[2] In addition to his FLSA-related claims, Meza alleges that inventory was stolen out of his truck one night after he had loaded the goods he needed for the next day. He claims that employees of IMM stole the goods so that he would be charged for the inventory shortage. Meza informed the police, but apparently took no further action. Meza claims that after the incident, he received threats of future thefts from other IMM employees. Meza also claims that IMM supervisors would sometimes intentionally place expired goods on the shelves of stores Meza serviced in order to recoup the cost of the goods, and that he was unfairly deprived of proceeds from an employee fund when he was terminated. While these allegations may be relevant to the question of whether Meza has other causes of action available to him, they do not impact the inquiry into whether he was an FLSA-exempt salesman, and do not bear on IMM's liability for overtime or minimum-wage violations.

[3] As the district court noted, Meza's complaint makes no retaliation claim against IMM.

No. 12-10785

## II. DISCUSSION

### A. Standard of Review and Burden of Proof

This Court reviews a grant of summary judgment de novo, applying the same standard as the district court. *Sanders–Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010). Summary judgment is appropriate if the movant has shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "All reasonable inferences are drawn in favor of the nonmoving party"—in this case, Meza—"but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions." *VRV Dev. L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 455 (5th Cir. 2011).

An employer bears the burden of proving that an employee is ineligible for overtime or minimum-wage compensation. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974). The employer must prove facts by a preponderance of the evidence that show the exemption is "plainly and unmistakably" applicable. *See Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1156–57 (10th Cir. 2012).

### B. Analysis

#### i. The FLSA and related DOL regulations

In 1938, Congress enacted the FLSA to "protect all covered workers from substandard wages and oppressive working hours." *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981); *see also* 29 U.S.C. § 202(a). One of the FLSA's requirements is that employers pay workers at one-and-a-half times their normal wages for hours worked in excess of forty per week. 29 U.S.C. §

207(a). The FLSA also requires that employees be compensated at a minimum average wage of $7.25 per hour. *Id.* § 206(a)(1).

These requirements do not apply to all workers, however. *See id.* § 213. Relevant to this appeal is the exemption for workers "employed . . . in the capacity of outside salesm[e]n." *Id.* § 213(a)(1). The logic of the exemption is that "[s]uch [a] salesman, to a great extent, works individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates." *Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–08 (10th Cir. 1941). An outside salesman's extra compensation comes in the form of commissions, not overtime, and because most of the salesman's work is performed away from the employer's place of business, the employer often has no way of knowing how many hours an outside salesman works. *Id.* at 208.

Congress did not expressly define "outside salesman," but it did authorize the Department of Labor to promulgate regulations defining the term and implementing other elements of the FLSA. 29 U.S.C. § 213(a)(1). According to those regulations, "[t]he term 'employee employed in the capacity of outside salesman'" means any employee:

> (1) Whose primary duty is (i) making sales within the meaning of section [203(k) of the FLSA[4]], or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

---

[4] Section 203(k) reads, in its entirety: "'Sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."

No. 12-10785

(2)    Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. §§ 541.500(a)(1)–(2). Section 541.700 of the DOL regulations defines "primary duty" as "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a).

Section 541.504 addresses the situation in which employees both deliver and sell products. The regulation provides a general overview followed by a list of factors to consider in determining if an employee is a deliveryman or an exempt outside salesman:

(a)    Drivers who deliver products and also sell such products may qualify as exempt outside sales employees only if the employee has a primary duty of making sales. In determining the primary duty of drivers who sell, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including loading, driving or delivering products, shall be regarded as exempt outside sales work.

(b)    Several factors should be considered in determining if a driver has a primary duty of making sales, including, but not limited to: a comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons; possession of a selling or solicitor's license when such license is required by law or ordinances; presence or absence of customary or contractual arrangements concerning amounts of products to be delivered; description of the employee's occupation in collective bargaining agreements; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; and proportion of earnings directly attributable to sales.

8

No. 12-10785

*Id.* §§ 541.504(a)–(b). The regulations further provide a list of examples of drivers who qualify as exempt outside salesmen:

(1)   A driver who provides the only sales contact between the employer and the customers visited, who calls on customers and takes orders for products, who delivers products from stock in the employee's vehicle or procures and delivers the product to the customer on a later trip, and who receives compensation commensurate with the volume of products sold.

(2)   A driver who obtains or solicits orders for the employer's products from persons who have authority to commit the customer for purchases.

(3)   A driver who calls on new prospects for customers along the employee's route and attempts to convince them of the desirability of accepting regular delivery of goods.

(4)   A driver who calls on established customers along the route and persuades regular customers to accept delivery of increased amounts of goods or of new products, even though the initial sale or agreement for delivery was made by someone else.

*Id.* §§ 541.504(c)(1)–(4). The final relevant portion of the regulations lists examples of drivers who *do not* qualify for the exemption:

(1)   A route driver whose primary duty is to transport products sold by the employer through vending machines and to keep such machines stocked, in good operating condition, and in good locations.

(2)   A driver who often calls on established customers day after day or week after week, delivering a quantity of the employer's products at each call when the sale was not significantly affected by solicitations of the customer by the

9

delivering driver or the amount of the sale is determined by the volume of the customer's sales since the previous delivery.

(3)    A driver primarily engaged in making deliveries to customers and performing activities intended to promote sales by customers (including placing point-of-sale and other advertising materials, price stamping commodities, arranging merchandise on shelves, in coolers or in cabinets, rotating stock according to date, and cleaning and otherwise servicing display cases), unless such work is in furtherance of the driver's own sales efforts.

*Id.* §§ 541.504(d)(1)–(3).  Neither list of examples is exhaustive.

We proceed first by applying the factors listed in 29 C.F.R. § 541.504(b) to Meza's case.  We then consider the relevance of the examples of exempt and non-exempt driver-salesmen listed in 29 C.F.R. §§ 541.504(c)–(d).  Finally, we review the applicability of the relevant precedent in this and other circuits.

*ii. Factors*

Of the nine listed factors, only one unequivocally favors Meza.  Two are inapplicable, one is inconclusive, and the remaining five favor IMM. The list of factors is not exhaustive, and a simple tally of the factors does not categorically settle the matter, but we find persuasive the fact that a majority of applicable factors favors IMM.

The first factor, "a comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons," favors IMM's position, though not overwhelmingly.  29 C.F.R. § 541.504(b).  The route salesmen like Meza are apparently the only salesmen at IMM.  The company also employed warehouse drivers, who delivered goods, but these employees were not authorized to make sales.  There is little in the record that speaks to the duties

of the warehouse drivers, so a precise comparison between their duties and Meza's is difficult. However, it would make little sense for IMM to have two distinct sets of employees whose primary responsibility was making deliveries. The existence of a formal division of labor suggests that the route salesman's job description contained something more than that.

The second factor, "possession of a selling or solicitor's license when such license is required by law or ordinances," is inapplicable since no such license is required to sell IMM's products. *Id.*

The third factor, the "presence or absence of customary or contractual arrangements concerning amounts of products to be delivered," is the subject of some dispute. *Id.* In his briefing, as well as in a sworn affidavit that postdates his deposition, Meza claims that the attendants with whom he spoke typically did not have the authority to purchase new products, or in some cases, even order goods to be restocked. IMM points out that this contradicts Meza's deposition, in which he stated, "The majority of the time the person that attended did have authority to buy the product." In his reply brief, apparently for the first time, Meza argues that the record transcript of this portion of the deposition contains a typo, stating that "when the testimony is read in context it is apparent that the word 'not' was left out of the transcript."

Meza is likely procedurally barred from making this argument. *See* Fed. R. Civ. P. 30(e) (explaining that a party who wishes to correct errors in a deposition transcript should submit a signed errata statement within thirty days of the deposition); *AG Acceptance Corp. v. Veigel*, 564 F.3d 695, 700 (5th Cir. 2009) ("Under this Circuit's general rule, arguments not raised before the

district court are waived and will not be considered on appeal unless the party can demonstrate 'extraordinary circumstances.'").

Regardless, it is not at all "apparent" from reading the rest of the transcript that the typo Meza complains of occurred. To the contrary, the parties present for the deposition appear to proceed on the assumption that Meza *was* interacting with attendants or cashiers with the authority to purchase goods. For example, Meza gives details about a number of the sales tactics he would use in trying to appeal to the store attendant. Additionally, Meza explicitly admits in his deposition that "[his] responsibility as a route salesman was to sell products to stores."

In any case, nowhere in the record or in either of the parties' briefing is the necessary corollary argument seriously asserted, i.e., no party claims that Meza's deliveries were merely fulfilling the terms of contracts that had been arranged by his supervisors or IMM's management. Tellingly, Meza specifically points out that supervisors, rather than route salesmen, were the only IMM employees who could authorize "specials," or significant price reductions, implying that it was route salesmen like Meza who were responsible for run-of-the-mill sales for the company. Indeed, one of Meza's supervisors testified that it would have been against company policy for a supervisor to make a sale to a store directly. For these reasons, it is difficult to conclude that many "customary or contractual arrangements concerning the amount of products to be delivered" existed, and this factor favors IMM.

The fourth factor, the "description of the employee's occupation in collective bargaining agreements," is inapplicable. 29 C.F.R. § 541.504(b).

The fifth factor, "the employer's specifications as to qualifications for hiring," also favors IMM. *Id.* Though the record does not indicate whether IMM specified additional hiring criteria, at the very least, the position for which Meza applied had been advertised as a salesman position, and he represented himself to the company as having sales experience.

The sixth factor, "sales training" also favors IMM. *Id.* Meza and the other route salesmen attended weekly sales training meetings, where supervisors announced prizes and incentives, explained sales tips, and notified the route salesmen of any products they were hoping to promote that week. Also, when Meza began his employment, he shadowed an experienced salesman as part of his initial training.

Because route salesmen at IMM did not attend sales conferences, the seventh factor, "attendance at sales conferences," favors Meza. *Id.*

The eighth factor, "method of payment," favors IMM. *Id.* Meza was paid a base salary of $300 *plus commission*. IMM also provided bonuses if sales reached a certain level in a given week. Meza alleges that while IMM initially offered incentives for bringing in new clients, those incentives were eliminated after a few weeks. Meza offers no evidence for this proposition other than his own testimony, but even if what he claims is true, the fact remains that Meza was paid according to a system that rewarded employees for making sales.

It is unclear whether the ninth and final factor, "proportion of earnings directly attributable to sales," favors IMM or Meza. *Id.* There is little guidance available as to what constitutes a high or low proportion of earnings directly attributable to sales. Meza averaged commissions of $164 per week in 2010, and

No. 12-10785

$233 per week in 2011. This corresponds to 35% and 44%, respectively, of his overall income.

We are inclined to hold for IMM on the sole basis that of the seven applicable factors, five favor IMM, one is inconclusive, and only one favors Meza. However, in an abundance of caution, we also review the DOL's listed examples of exempt and non-exempt drivers and the case law interpreting this FLSA exemption.

*iii. Examples*

Analogy to the examples of exempt and non-exempt drivers listed in the DOL regulations also lends support to IMM's position. Meza's role at the company had a number of the characteristics listed in the descriptions of exempt driver-salesmen: Meza "provide[d] the only sales contact between the employer and the customers visited, [he] call[ed] on customers and [took] orders for products, [he] deliver[ed] products . . . and [he] receive[d] compensation commensurate with the volume of products sold." 29 C.F.R. § 541.504(c)(1). As discussed above, *supra* Part II.C.*ii.*, Meza "obtain[ed] or solicit[ed] orders for the employer's products from persons who ha[d] authority to commit the customer for purchases." *Id.* § 541.504(c)(2). He "call[ed] on new prospects for customers along [his] route and attempt[ed] to convince them of the desirability of accepting regular delivery of goods." *Id.* § 541.504(c)(3). The applicability of any one of the regulations' listed examples would be persuasive; that three aptly describe Meza's duties is arguably decisive.

Similarly, for the most part, the listed examples of non-exempt drivers mostly do not describe the kind of work Meza performed. IMM did not require that he restock or maintain vending machines. *See id.* § 541.504(d)(1). Meza's

14

sales promotion work was performed as part of his own sales efforts, not those of his supervisors or of other employees. *See id.* § 541.504(d)(3) (stating that activities like "placing point-of-sale and other advertising materials, price stamping commodities, arranging merchandise on shelves, in coolers or in cabinets, rotating stock according to date, and cleaning and otherwise servicing display cases" describe the work of a non-exempt salesman "*unless such work is in furtherance of the driver's own sales efforts*" (emphasis added)).

It is true that Meza is on firmer ground in arguing that he was "[a] driver who often call[ed] on established customers day after day or week after week, delivering a quantity of the employer's products at each call when the sale was not significantly affected by [his] solicitations of the customer . . . or the amount of the sale [was] determined by the volume of the customer's sales since the previous delivery." *Id.* § 541.504(d)(2). Meza claims that even if he began his employment as an outside salesman, the nature of the work changed over the course of his time with IMM, so that by the end there were so many stops on his route that he only had time to make deliveries and generate a list of items to be restocked based on what had been sold by each convenience store. Even if Meza's assertion is accurate, however, he was still the only sales contact between IMM and the convenience stores on his route—any sales that were made were "significantly affected" by Meza. Furthermore, even if we were to concede that this illustration of a non-exempt driver describes Meza, he must still contend with the fact that he also fits easily within three of the regulations' descriptions of exempt driver-salesmen.

No. 12-10785

*iv. Case law*

Both parties argue that the case law interpreting the outside salesman exemption requires a holding in their favor. IMM relies heavily on *Jewel Tea Co. v. Williams*, 118 F.2d 202 (10th Cir. 1941) and *Hodgson v. Krispy Kreme Doughnut Co.*, 346 F. Supp. 1102 (M.D.N.C. 1972). *Jewel Tea* involved salesmen, paid on commission, who would travel a specified route in company-owned cars, visiting potential customers' homes in hopes of selling coffee and tea products. *Jewel Tea*, 118 F.2d at 203–04. The court found the employees were primarily salesmen, rather than deliverymen. *Id.* at 208. The court in *Hodgson* similarly found the traveling doughnut salesmen at issue were exempt, because they were designated "salesmen" on the payroll, nearly all of their work was performed away from the company's place of business, and the salesmen were not delivering doughnuts pursuant to any pre-existing contractual arrangements. 346 F. Supp. at 1107.

Meza meanwhile focuses primarily on *Skipper v. Superior Dairies, Inc.*, 512 F.2d 409 (5th Cir. 1975). In that case, this Court determined that the outside salesman exemption did not apply to an employee who delivered dairy products to convenience stores owned primarily by one company. *Skipper*, 512 F.2d at 413–416. The deliveryman's managers had typically entered into contracts with the management of the convenience store company, which determined how much milk the employee would bring to a given store. *Id.* at 414–15. The Court summarized with approval the district court's observation that the employee "did no selling, in the sense that he had no face-to-face-negotiation with a store owner or manager who was in the position of purchasing or ordering the products which [the employee] was delivering. . . . [T]he right to

place the product in each individual store . . . was obtained by negotiation between the management officials of Superior Dairies and officials of Mini Mart." *Id.* at 413. That is not the case here. As discussed, Meza makes no assertion that anyone at IMM other than the route salesmen was responsible for any aspect of sales to IMM's customers, other than rare instances of negotiating the terms of "special" price reductions with certain stores.

Meza also argues that *Skipper* dictates a finding that his work was non-exempt because that Court emphasized "the rule that an employee's performance of both exempt and non-exempt activities during the same work week defeats any exemption that would otherwise apply." This argument is unavailing because, in this case, Meza never performed work that could not be classified as either sales or work incidental to his sales, and therefore never performed non-exempt activities.

Meza also devotes much discussion to *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012). While that case admittedly did discuss the outside salesman exemption, it dealt with whether pharmaceutical sales representatives fell within the terms of the exemption, and as a result offers little guidance as to how a court determines if a driver is a deliveryman or a salesman for FLSA purposes. *See Christopher*, 132 S. Ct. at 2164, 2170–73. It is true that the *Christopher* Court emphasized that "the FLSA's exemption for outside salesmen . . . is premised on the belief that exempt employees typically earned salaries well above the minimum wage and enjoyed other benefits that set them apart from the nonexempt workers entitled to overtime pay." *Id.* at 2173 (alterations and internal quotation marks omitted). Meza, who was paid on average $6.66 an hour, was compensated meaningfully below the minimum

wage. *Christopher*, however, merely found that the employees at issue, who made significantly more than minimum wage, were not the sort of employees the FLSA was meant to protect, thus implying only that earning significantly more than minimum wage may *preclude* relief under the statute. *Id.* at 2173. No aspect of the opinion suggests that earning less than minimum wage is itself *sufficient* for relief. The fact is that there is no way to eliminate the possibility that Meza's relatively low compensation was due solely to poor salesmanship; in any event (and perhaps for that very reason), the regulations do not indicate that a court should consider a salesman's effective compensation in determining whether the exemption applies. Our application of the regulations persuades us that, for purposes of the FLSA, Meza was more similar to an outside salesman than to a deliveryman. IMM was therefore excused from paying him the wages that statute would otherwise mandate.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment for IMM.