James D. **HODGSON**, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**KRISPY KREME DOUGHNUT COMPANY, Defendant.**

Civ. A. No. C–69–G–68.

United States District Court, M. D. North Carolina, Greensboro Division.

Aug. 25, 1972.

James H. Woodson, U. S. Dept. of Labor, Atlanta, Ga., for plaintiff.

John M. Minor, William K. Davis, Winston Salem, N. C., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

This action is brought by the Secretary of Labor, pursuant to Section 17 of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., to enjoin defendant from violating the overtime requirements of the Act, and to restrain continued withholding of unpaid overtime compensation to its driver-salesman employees, and violations of the record-keeping provisions of the Act. Jurisdiction of the Court is attained pursuant to Title 29 U.S.C. § 217.

The rights and privileges of the parties are governed by the Act and regulations promulgated pursuant thereto.

Defendant, upon whom the burden rests, contends that the employees in question are outside salesmen within the exemptions set forth in 29 U.S.C. § 213(a)(1).

■ The law requires that the claimed exemption must be narrowly construed against the employer seeking to assert it. See Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1959). The employer must prove that the exemption is applicable by plain and unmistakable evidence. See Arnold v. Ben Kanowsky, Inc., *supra*. In short, the exemptions are limited to those falling expressly within the statute. Wirtz v. Lunsford, 404 F.2d 693, 697 (6th Cir. 1968); Hodgson v. Klages Coal and Ice Co., 435 F.2d 377, 382 (6th Cir. 1970).

■ The issue is primarily one of fact. Walling v. General Industries Co., 330 U.S. 545, 550, 67 S.Ct. 883, 91 L.Ed. 1088 (1947).

■ The Court having heard the evidence concludes that the defendant has borne the required burden, and considering all the facts adduced bearing on the work of the employees in question as a whole, is satisfied that they are outside salesmen to whom the exemption applies. This conclusion is based on the following findings of fact:

Defendant, Krispy Kreme Doughnut Company, is a corporation having a branch place of business and doing business at 1603 Battleground Avenue, Greensboro, Guilford County, North Carolina, where at all times pertinent hereto it has been engaged in the manufacture, sale and distribution of doughnuts and other pastry products. Defendant has not maintained a record of daily or weekly hours worked by its driver salesmen, each of whom has averaged about 46 hours per work week, and has compensated its driver salesmen by a salary or by commissions, or by a combination of salary and commissions; defendant has not established an hourly rate of compensation for its driver salesmen and has therefore not compensated said employees at additional half-time rates for hours worked in excess of 40, 42 or 44 hours per work week.

Defendant has developed quality controls on its mix and methods of processing doughnuts designed to produce a line of doughnuts of uniform high quality.

The products are displayed for sale in the retail area of its establishment or packaged for outside distribution in various sales territories radiating from the plant. During the period here involved, Greensboro had some seven or eight such outside sales territories. These territories have geographical limitations, with a route salesman assigned to each. The territories are designed to the end that considering many factors, the sales potential are approximately the same in each.

All Krispy Kreme products sold in the various territories are displayed for sale in distinctively colored packages. Doughnuts are described as an "impulse" item and their sales depend upon factors of freshness, attractiveness in appearance, packaging, placement and display, so as to initiate the buying impulse of the consumer. They compete with numerous other impulse items. The factors of perishability, short shelf life, and narrow time period for consumption create special problems in the sale and distribution of doughnuts as compared to other snack or breakfast items. Defendant's uncontradicted testimony is to the effect that doughnuts have the shortest shelf life of competing impulse food items.

The outside sales territories in the Greensboro area have gone from the original one operated out of Winston-Salem, North Carolina, to eight, all being operated from the Greensboro plant. After a route develops in sales to the point that actual sales plus potential market indicate the desirability of splitting the old route, and established customers, the sales territory is divided and other areas assigned, so that two sales territories are created. In some instances only a very small portion of established customers is assigned to a new territory and the salesman assigned has the task of obtaining new customers sufficient in number and quality to make the new territory profitable. Greensboro has developed its sales territories by both of these methods. One man is assigned to each such territory and is designated by the Company as the route salesman in charge.

Each route salesman is responsible in his territory for obtaining new regular customers; for keeping and serving old regular customers; for developing additional sales to established regular customers; employing practices and techniques to meet and combat constant competition from other snack items and from some four or more other doughnut distributors. Each route salesman determines the starting time, pattern, and number of hours to be devoted to serving his sales territory, being held responsible for results only. Each salesman determines the number of doughnuts to be ordered daily to service his customers, and plant production for outside sales is based on such orders. In so ordering, each salesman daily takes into account weather factors, competition, the day of the week and month, past sales history of each customer and special factors. All of these factors, and others, are considered by each salesman in ordering production for his territory. Each submits his order daily for the amount and variety of doughnuts desired for the next day. The order form also includes space for ordering samples which are not charged to the salesman. All other items are charged and each salesman must account each day by cash or credit slips for his entire order. Each salesman extends credit on his own responsibility to certain customers but may submit names of customers for Company-approved credit.

Each salesman is also responsible for development of "special order" business. Special order business arises from contacts with institutions, organizations or groups which are desirous of raising funds to support various activities. Each salesman builds up a listing of such special order customers and attempts to obtain additional ones.

Each salesman receives compensation based solely, or in large part, on a percentage commission on net sales, both to regular and special order customers.

Some salesmen receive, in addition to commissions, a base pay ranging from $10.00 to $30.00 a week, which is based on variable factors such as outstanding sales development, distance to be traveled, experience, and changes in territory. This base pay may be increased, on a temporary basis, when a salesman is put into a new territory with few or no established customers, or when an existing territory is divided. Salesmen work an average of about 46 hours per week. During the year 1965 full-time salesmen ranged from a low weekly average of $104.91 to a high of $148.77; in 1966 from $107.22 to $160.12; in 1967 from $118.18 to $174.10; in 1968 from $130.92 to $163.55; in 1969 from $149.18 to $205.26. Outside sales of defendant's products in the sales territories to both regular and special order customers increased from a total of $459,842.00 in the 1965–66 fiscal year (September-August), to $632,216.00 in 1969–70. The differences in compensation paid to the various salesmen are directly related to the individual salesman's success or lack of success in obtaining new customers, increasing sales to established customers and special order business obtained.

Sales territories embrace from a low of some 100 regular customers to a high of some 140 regular customers. In order to service regular customers daily and to get fresh doughnuts to them in time to be sold in the consumer purchasing period from 5:30–11:00 a.m., a system of "set offs" is arranged where possible, with the customer. This "set-off" system involves the salesman leaving the plant early enough (from about 1:00 a.m. to 3:30 a.m.) so that they can deliver the order of doughnuts to about 75–80% of their eating establishments and small grocers prior to the time (usually about 6:00 a.m.) the customer opens for business. Thus, the salesman must persuade each "set-off" customer to accept delivery at his place of business while it is closed, with the customer being responsible for carrying the doughnuts inside, displaying them for sale, and removing and storing doughnuts left over from the previous day. Left over doughnuts are picked up by the salesman, returned for credit, and destroyed or sold for animal feed. The customer is charged only for those doughnuts actually sold. The set-off system permits, and requires, fairly consistent contact of the customer. Each customer, where the product is set off, is contacted by the salesman in person at least once a week, and as often as three times a week. The salesman endeavors to promote steps which will increase sales to such customer. These steps involve discussing sales on various days of the week, attempts to obtain better position for displaying doughnuts to increase the impulse factor, suggesting new varieties, and creating good will with other employees of a customer, since the attitudes of such employees toward the salesman and his product often is a determinative factor in increased sales.

The defendant's salesmen contact the routemen for vending and caterer customers and seek to increase their use of doughnuts, suggest new varieties, and contact the manager or operator for the same purpose. A defendant salesman never places doughnuts in a vending machine, for all of his contacts are at the vending or catering customer's place of business.

The salesman in each territory is responsible for soliciting new business among chain stores and in increasing sales to established chain store customers. No chain store customer in any sales territory here involved purchases doughnuts in amounts or quantities which are prearranged, either exactly or approximately, by such customer or contractual arrangement. In each chain store it is the route salesman's responsibility to develop increased sales by obtaining better shelf display space; by persuading the manager or other personnel to permit the salesman to install a separate rack for the sole display of defendant's products; to persuade chain store personnel to permit the location of such rack in the best possible location for the sale of impulse items, and to per-

suade the chain stores, from time to time, to sell doughnuts at a special, reduced price to increase demand. In each territory the salesman develops techniques of producing and using pertinent information as to those facts which might affect his sales. In some instances such data is acquired from cashiers, stock clerks, managers, assistant managers, produce clerks, and other personnel. The competition is constant, and it requires daily attention to maintain and increase sales to chain stores. Each salesman prepares invoices for sales to chain stores in his territory and delivers, and, most often, collects. In some instances invoices are paid by check mailed to the Greensboro shop of Krispy Kreme. In some instances either the initial sale to a chain store, or sales efforts to regain such a customer which was lost for some reason, has required as many as fifteen calls upon the store manager by the route salesman.

New salesmen are obtained by reference, applications, or ads. Ads state that the position is that of a "Route Salesman." A guaranteed salary is paid during the training period, and commissions on sales thereafter. The training is conducted at and from the Greensboro shop by sales managers or route supervisors. A definite program is followed, consisting of acquainting the new employee with the content of the route sales job. It includes reviewing the products to be sold, and the production and quality standards and methods; the handling of the product; the servicing of established customers; and training in increasing sales to established customers and gaining new business, both regular and special. The route supervisor accompanies the new man almost daily during this period and checks his performance of the various aspects of his work. As he gains proficiency he is given more responsibility and is expected to perform on his own. When he has reached a certain level of competence he is allowed to work his territory on his own. Thereafter training continues, with the route supervisor accompanying

him on his territory from time to time. The route supervisor discusses sales with each salesman on an almost daily basis. The salesmen discuss sales and sales techniques between themselves on a daily basis, exchanging information. The monthly paper of the company contains, almost every month, special articles dealing with outside sales, route sales techniques, promotional materials, articles dealing with specific salesmen, and passing on valuable selling tips. About once a year an entire issue of the paper is devoted to outside route sales. The managers and sales managers or route supervisors conduct formal sales meetings from once a week to perhaps once a month, depending on various factors. At these meetings various aspects of their selling job are discussed. Contests on both the local and group of stores levels are conducted from time to time, in which prizes are awarded for increased sales. Regular clinics in salesmanship are conducted by home office personnel.

Each salesman is expected to produce an annual rate of growth in regular customers and volume of sales equal to about 8–10% per year. Thus, if a territory starts off the year with some 80 regular customers, it is expected that the salesman will solicit enough prospects to produce some eight additional new accounts during the year. In addition, normal losses in customers and volume during the year amount to about 10%, or in an 80-customer territory, some eight accounts. Such losses occur through competition, customers going out of business, deaths, changes in management and other causes. Thus, each route salesman must solicit sufficient prospects and obtain solid new customers equal to about 20% of his volume in order to replace lost accounts and maintain healthy growth. Greensboro's outside sales in the sales territories and by route salesmen increased some 39% over the four-year period from 1965 to 1969. The defendant has not and did not advertise by radio, television, newspaper, or other publications (except complimen-

tary ads in school publications) during this four-year period. Increases in consumer demand were also related to the successful application by the route salesmen of sales techniques designed to increase consumer acceptance of doughnuts as an impulse item. Except for such solicitation help as might have been provided by the route supervisors on an infrequent basis or on special occasions, the increase in outside sales was directly attributable to the efforts of the route salesmen here involved.

The route salesmen here involved are trained in and have consistently applied an "undersell" method of building demand for defendant's products. This undersell method is closely related to the short shelf life and high perishability of the products; and the fact that the buying impulse of the consumer is best initiated by his knowledge that the doughnuts are fresh each day. To insure this, the salesman attempts to slightly undersell each of his customers so that there will be requests for increasing orders. In short, defendant undersells on the theory that a customer who complains, in the presence of his patrons, about not having enough doughnuts will increase consumer demand.

The sales work, solicitation, training, and basic undersell methods of defendant have remained basically unchanged since about 1938. During the period from the enactment of the Fair Labor Standards Act of 1938 until the present, defendant has consistently classified all employees engaged in the type of work performed by the route salesmen in Greensboro as being "outside salesmen." Defendant has consistently claimed on its records that such employees are exempt from the provisions of Sections 6 and 7 of said Act as being "outside salesmen" within the meaning of Section 13 of said Act. During the period from 1946 to the institution of this action on 16 May 1968, defendant's payroll records, showing on their face such claimed outside salesmen exemption, have been examined by personnel of the United States Department of Labor, Wage and Hour and Public Contracts Divisions, on some fifty occasions. Until shortly before the institution of this action, plaintiff had never questioned said claimed exemption and had acquiesced therein by its failure to question the same.

At least one sales territory operating out of the Greensboro, North Carolina shop during the period involved crossed the Virginia state line and embraced the City of Danville, Virginia, and surrounding areas in Virginia. Hereafter, such territory is referred to as the "interstate territory."

The salesmen engaged in the territories operating out of Greensboro during the periods involved in this action were each designated on defendant's records, including payrolls, as "salesmen," "route salesmen," or by such similar terms. All of their activities except those involved in ordering, loading and unloading vehicles, keeping records, and attendance at sales meetings were performed away from the defendant's Greensboro plant. None of the customers of any salesmen were required by contractual arrangement to purchase from defendant or said salesmen, and each customer could terminate at will. All of the work performed by each salesman, including ordering production for use in his territory, loading his truck with doughnuts and other products he ordered, driving the truck, delivering the products sold, returning stales, keeping records of sales, making invoices and collecting payment for products delivered, was incidental to and in conjunction with each salesman's outside sales activities. Such activities occupied far in excess of 80 percent of the hours in each said salesman's work week.

An appropriate order will enter.