Stacy L. NIELSEN, et al., Plaintiffs,

v.

DEVRY INC., a/k/a Devry University, Inc., Defendant.

No. 4:02–CV–23.

United States District Court, W.D. Michigan, Southern Division.

Dec. 17, 2003.

Dale E. Bock, Flint, MI, for Plaintiffs.

Justin M. Crawford, Noah A. Finkel, Elizabeth Wells Skaggs, Grand Rapids, MI, for Defendant.

## *OPINION*

QUIST, District Judge.

Plaintiffs in this action are Stacy L. Nielsen and 173 other past and present employees of Defendant, DeVry, Inc. ("DeVry"). Plaintiffs allege that DeVry denied them overtime compensation for hours routinely worked in excess of 40 per week, in violation of the Fair Labor Standards Act of 1938 (the "FLSA"), 29 U.S.C. §§ 201 *et seq.* Now before the Court is DeVry's motion for summary judgment, in which DeVry asserts that Plaintiffs' claims fail as a matter of law because Plaintiffs fall within the "outside sales" or alternatively the "administrative" exemptions of the FLSA. For the reasons stated below, the Court will grant DeVry's motion for summary judgment because Plaintiffs are exempt as outside salespersons.

## I. *FACTS AND PROCEDURAL HISTORY*

DeVry is a for-profit company that provides career-oriented, technology-based higher education at more than 25 campuses nationwide. DeVry employs certain personnel, referred to throughout this opinion as field representatives, whose job is to identify potential students, persuade them to apply, and follow through with them to ensure they ultimately pay tuition and begin classes. Plaintiffs in the present action are or were employed as DeVry field representatives.

DeVry hires field representatives by advertising in newspapers and on the internet. Newly hired field representatives undergo a month of training, where they learn, among other things, about DeVry's educational programs and services, as well as techniques for finding potential students and getting them to come to DeVry. A manual issued at this training provides guidance on various aspects of the job, and throughout their employment field representatives receive additional training by way of audio tapes and workbooks.

After completing initial training, field representatives are assigned a specific territory in which to work. Each is responsible for setting his or her own schedule, although DeVry imposes performance quotas such as the number of telephone calls, high school visits, student appointments, and application signings. Field representatives do much of their work in high schools. They begin by contacting high school career counselors and principals in order to build relationships and set up workshops where they make presentations to juniors and seniors. They also collect career profile surveys in which students provide contact information, grade point averages, career interests, and an indication of whether they are interested in receiving more information about DeVry. The field representatives use this information to assess whether the student is likely to qualify for and be interested in DeVry.

Based on this initial assessment of which students would be viable candidates, field representatives begin the process of pursuing individual prospects. First, the field representative calls the student at home to confirm the student's interest and qualifi-

cations and to arrange a home interview with the student and his or her parent(s). Next, the field representative goes to the student's home to meet with what DeVry calls the "buying committee"—the student, the student's parent(s), and any other person necessary to the student's decision to attend DeVry. The hour-long home interview includes a laptop presentation and a Profile Interest Evaluation designed to provide an overview of career options and DeVry's programs and services, and also to help the field representative further evaluate the student's interests, qualifications, and degree of family support. If the student is deemed a viable candidate and desires to apply, the field representative assists the student in completing an application, collects a $100 application fee, reviews financial aid procedures with the family, instructs the student to contact the campus, and discusses succeeding steps the student must take to attend DeVry.

Field representatives send completed applications to the student's chosen DeVry campus. After the student contacts the campus to verify his program selection, a campus coordinator inputs the student's information into DeVry's computer system. DeVry does not have an open admissions policy, but unlike many colleges, makes admissions decisions based on strictly objective criteria. All students who hold a high school diploma or GED and meet DeVry's SAT/ACT requirements are automatically offered admission. Students who lack the required SAT/ACT scores have two chances to pass DeVry's own college placement test.

Field representatives remain involved with potential students following their application in a process known as "stitching-in." DeVry's field representative manual instructs field representatives to contact applicants numerous times after the home interview to affirm their intention to attend DeVry and help with preparation of financial aid paperwork. Field representatives stay in contact with applicants who may be wavering in order to ensure they begin classes and pay tuition. Throughout this process, field representatives submit daily and weekly activity and progress reports to supervisors.

DeVry pays field representatives a salary, which may increase or decrease periodically based on the field representative's achievement of established objectives, including number of high schools lectured, number of career profile surveys completed, number of home interviews, average application to interview rate, number of applicants tested, and most importantly, number of students who actually start school at DeVry. In addition, each year, DeVry recognizes field representatives who achieve a predetermined number of tuition-paying student starts with an all expense paid, three day trip to a resort. Typically 10–20% of field representatives earn this reward.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Id.* at 248, 106 S.Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* This standard requires

the non-moving party to present more than a scintilla of evidence to defeat the motion. *Id.* at 251, 106 S.Ct. at 2511 (citing *Improvement Co. v. Munson*, 81 U.S. 442, 14 Wall. 442, 448, 20 L.Ed. 867 (1871)).

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi*, 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### III. *DISCUSSION*

DeVry argues that it is entitled to judgment as a matter of law because Plaintiffs fall within the outside sales exemption, or alternatively, within the administrative capacity exemption. As discussed below, the Court finds that based on the undisputed facts, DeVry has met its burden of showing that the work Plaintiffs performed as field representatives plainly and unmistakably satisfies the terms and spirit of the "outside sales" exemption. Because DeVry is entitled to judgment on the outside sales exemption, it is not necessary for the Court to consider whether the administrative exemption would apply in the present case.

### A. Fair Labor Standards Act

The overtime provisions of the FLSA establish the general rule that employees must be compensated at a rate not less than one and one-half times their regular rate for all overtime hours. 29 U.S.C. § 207(a)(1). However, these overtime compensation provisions do not apply to "any employee employed in a bona fide ... administrative ... capacity ... or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor])." 29 U.S.C. § 213(a)(1).

An employer relying on an exemption to the minimum wage and overtime provisions of the FLSA has the burden of proving that the employee is properly classified under the exemption. *Mich. Ass'n of Gov't Employees v. Mich. Dep't of Corr.*, 992 F.2d 82, 83 (6th Cir. 1993). In light of the FLSA's broad remedial aims, the exemptions from the FLSA's coverage must be narrowly construed against the employers seeking to assert them. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960). An employer seeking to assert an FLSA exemption has the burden of proving that the employee falls "plainly and unmistakably within the terms and spirit" of the exemption. *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945). *See also Arnold*, 361 U.S. at 392, 80 S.Ct. at 456 (1960); *Douglas v. Argo–Tech Corp.*, 113 F.3d 67, 70 (6th Cir.1997). The question of how an employee spends his time is a question of fact, while the question of whether his activities fall within an exemption is a question of law. *Reich v. Wyoming*, 993 F.2d 739, 741 (10th Cir.1993). *See also Dalheim v. KDFW–TV*, 918 F.2d 1220, 1226 (5th Cir.1990) (stating that "the ultimate determination of whether

an employee is exempt .... [is] properly characterized as a conclusion of law," even though "based on both historical fact and factual inferences").

■■■ The specific parameters of the FLSA's exemptions are not set forth in the statute, but instead are articulated in the regulations and interpretations of the Secretary of Labor. The regulations, promulgated pursuant to an express delegation of legislative authority, are to be given controlling weight unless found to be arbitrary, capricious, or contrary to the statute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). On the other hand, the Secretary's interpretations are not conclusive, as they merely set forth the Department of Labor's official position on how the regulations should be applied in specific contexts. *See Reich v. Newspapers of New England, Inc.,* 44 F.3d 1060, 1070 (1st Cir.1995). Agency opinion letters do not have the force and effect of law, are not binding on courts, and are not given Chevron-style deference. *See Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000). Even so, these interpretations have the "power to persuade, if lacking power to control," as they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). "The weight of such a judgment [of the authority of an agency interpretation] in a particular case will depend upon the thoroughness evidenced in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.*

## B. Outside Sales Exemption

■■■ Plaintiffs argue that they were entitled, pursuant to the FLSA, to be paid overtime compensation for hours routinely worked in excess of 40 per week. DeVry maintains that Plaintiffs fall within the outside sales exemption to the FLSA's wage and hour requirements. The FLSA exempts from its overtime provisions "any employee employed ... in the capacity of outside salesman." 29 U.S.C. § 213(a)(1). The outside sales exemption derives from the incompatibility of minimum wage requirements with the individual character of the work of such salespersons. *Jewel Tea Co. v. Williams,* 118 F.2d 202, 208 (10th Cir.1941). The term "outside salesman" is defined in 29 C.F.R. § 541.500 to mean any employee:

(a) Who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in:

(1) Making sales within the meaning of section 3(k) of the Act; or

(2) Obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(b) Whose hours of work of a nature other than that described in paragraph (a)(1) or (2) of this section do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employers: *Provided,* That work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

In the present case, the parties dispute whether Plaintiffs were outside salespersons as that term is defined above. Specifically, the parties disagree as to whether DeVry has established the following elements of the outside sales exemption: (1)

whether Plaintiffs' work comprised "sales" or "obtaining orders or contracts for services," (2) whether Plaintiffs were "customarily and regularly" engaged "away from" Defendant's place of business, and (3) whether Plaintiffs' non-sales activities did not exceed 20 percent of the hours worked by nonexempt employees. The Court will address these three elements in turn.

### 1. Whether Plaintiffs' Work Activities Comprised Sales or Obtaining Contracts or Orders

The first element of the outside sales exemption requires DeVry to prove that Plaintiffs' work comprised "sales" or "obtaining orders or contracts for services." 29 C.F.R. § 541.500. For the reasons discussed below, the Court finds that DeVry has proved this element of the outside sales exemption.

The FLSA defines "sale" as "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). The Regulations discuss in greater detail the meaning of "making sales or obtaining orders":

(a) Section 541.5 requires that the employee be engaged in: (1) Making sales within the meaning of section 3(k) of the Act, or (2) obtaining orders or contracts for services or for the use of facilities.

(b) Generally speaking, the divisions have interpreted section 3(k) of the Act to include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property. Thus sales of automobiles, coffee, shoes, cigars, stocks, bonds, and insurance are construed as sales within the meaning of section 3(k). (Section 3(k) of the Act states that "sale" or "sell" includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.)

(c) It will be noted that the exempt work includes not only the sales of commodities, but also "obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer." "Obtaining orders or * * * for the use of facilities" includes the selling of time on the radio, the solicitation of advertising for newspapers and other periodicals and the solicitation of freight for railroads and other transportation agencies.

(d) The word "services" extends the exemption as outside salesmen to employees who sell or take orders for a service, which is performed for the customer by someone other than the person taking the order. For example, it includes the salesman of a typewriter repair service who does not himself do the repairing. It also includes otherwise exempt outside salesmen who obtain orders for the laundering of the customer's own linens as well as those who obtain orders for the rental of the laundry's linens.

(e) The inclusion of the word "services" is not intended to exempt persons who, in a very loose sense, are sometimes described as selling "services." For example, it does not include persons such as servicemen even though they may sell the service which they themselves perform. Selling the service in such cases would be incidental to the servicing rather than the reverse. Nor does it include outside buyers, who in a very loose sense are sometimes described as selling their employer's "service" to the person from whom they obtain their goods. It is obvious that the relationship here is the reverse of that of salesman-customer.

29 C.F.R. § 541.501.

### (a) Opinion Letters

The Department of Labor ("DOL") has issued two opinion letters addressing the

question of whether the college "admissions counselors" or "enrollment advisors" described in the factual scenarios submitted to the agency performed sales or obtained contracts for services such that the outside sales exemption would apply. Both opinion letters contain the following language:

> Ordinarily, an individual who regularly performs recruitment for a college is not engaged in making sales of the college's services, or obtaining contracts for its services. Rather, college recruitment activity appears analogous to sales promotion work, since, like a promotion person who solicits customers for a business, the college recruiter is engaged in identifying qualified customers, i.e., students, and inducing their application to the college, which in turn decides whether to make a contractual offer of its educational services to the applicant.

> Opinion Letter, Wage and Hour Division, U.S. Dept. of Labor, 1998 WL 852683 (1998); Opinion Letter, Wage and Hour Division, U.S. Dept. of Labor, 1999 WL 1002391 (1999).

It appears that the opinion letters' conclusion that the college recruiters were not engaged in sales activities rests primarily on the fact that the recruiters did not make contractual offers of educational services (i.e., admissions decisions) to applicants. The college recruiters were not "engaged in making sales of the college's services." Rather, "like a promotion person who solicits customers for a business," the recruiters merely "identified qualified customers" and "induced their application," while it was the college itself that decided "whether to make a contractual offer of its educational services to the applicant." For this reason, the opinion letters deemed college recruitment more analogous to sales promotion than sales.

The holdings of these opinion letters are limited to the facts submitted in those particular cases. An opinion letter is authoritative only to the extent that the scenario it discusses resembles the scenario before the court. "The weight of such a judgment [of the authority of an agency interpretation] in a particular case will depend upon the thoroughness evidenced in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

The undisputed facts of the present case differ in several ways from those considered in the opinion letters. First, it appears that in the opinion letters, the task of the college admissions counselors and enrollment advisors ended when a prospective student sent in an application: "a successful recruitment is one in which the enrollment advisor personally obtains a signed enrollment application from a prospective student, along with a nonrefundable $50.00 application fee." Opinion Letter, Wage and Hour Division, U.S. Dept. of Labor, 1998 WL 852683 (1998). In contrast, the DeVry field representatives in the present case continued their efforts until prospective students paid tuition and began attending classes. A field representative's potential for salary enhancements and eligibility for recognition and rewards was based primarily on the number of tuition-paying student starts the employee achieved, not just the number of applications the employee collected. DeVry used a special term, "stitching-in," to describe a field representative's follow-up activities with a prospective student from the point of application to the first day of class. Field representatives received training in "stitching-in" techniques, a process that required extensive work to ensure that prospects who had applied ultimately showed up at school.

Second, the opinion letters assumed that the college recruiters under consideration were not involved in deciding "whether to make a contractual offer" of the colleges' services to the applicant. Although it is not entirely clear from the facts presented, the opinion letters seem to have involved traditional colleges with admissions committees tasked with evaluating an application and deciding whether to admit a student. Recruiters persuaded potential students to send in applications, and then admissions personnel took over to decide whether the students would be admitted. In contrast, there is no indication that DeVry, a for-profit corporation, had this sort of admissions process. Instead, DeVry used strictly objective admissions criteria, requiring only a high school diploma or GED and certain test scores. While DeVry did not have an "open" admissions policy (i.e., anyone can attend), anyone meeting the objective requirements was automatically admitted. The circumstances in the present case, therefore, do not reflect the dichotomy discussed in the opinion letters between recruiters who solicit applications and admissions personnel who make admissions decisions. At DeVry, there really was no admissions "decision" to make; those meeting the objective criteria were admitted, those who did not were rejected. If anyone made a decision pertaining to admissions, it was the field representatives, who were responsible for sorting out from the general population of prospective students which ones were DeVry material.

**(b) Indicia of Sales Activities Discussed in Case Law**

 Courts have articulated various factors probative of an employee's status as an outside salesperson, including whether the employee: must solicit new business; receives specialized sales training; was hired and denominated as a salesperson; and whether the position was advertised as a sales position. *See Fields v. AOL Time Warner, Inc.,* 261 F.Supp.2d 971, 974 (W.D.Tenn.2003) (citations omitted). Other indicia of sales-related activities, discussed below, include commission compensation, specialized sales training, and lack of direct or constant supervision. In deciding whether an employee is an outside salesperson, the Court must look beyond labels and descriptions and also inquire into the particular facts of the actual work performed. *See, e.g., Ale v. Tenn. Valley Auth.,* 269 F.3d 680, 688–89 (6th Cir.2001); *Fields,* 261 F.Supp.2d at 975. None of the indicia of sales-relatedness can be considered in isolation. Instead, the Court must consider the totality of the circumstances in a task-related context. *See Hodgson v. Krispy Kreme Doughnut Co.,* 346 F.Supp. 1102, 1103 (M.D.N.C.1972). What follows is an application of the aforementioned factors to the present case.

 An employee is more likely to be considered engaged in sales if the job was advertised as a sales position and the employee was recruited based on sales experience and abilities. *See, e.g., Krispy Kreme,* 346 F.Supp. at 1106; *Jewel Tea,* 118 F.2d at 208. In the present case, DeVry posted available field representative positions in newspapers and on internet sites under the "sales" category. Although these advertisements designated the positions using the terms "educational representative" and "field representative" as job titles, the advertisements went on to state that DeVry sought "sales professionals" who had a "successful sales background" and "who are able to thrive in an entrepreneurial environment." Individuals seeking to be hired as field representatives mentioned their prior sales experience on their applications. Plaintiffs' formal job titles did not include the word "sales," but labels are not dispositive. "Instead, the actual

job duties and actions performed by the employee are dispositive." *Fields,* 261 F.Supp.2d at 975 (finding that employees were exempt outside salespersons, even though their employer's internal job description classified them as "non-exempt"). DeVry's recruiting and hiring practices suggest that Plaintiffs filled sales positions.

■ Specialized sales training is another factor indicative of whether an employee is engaged in sales. *See Fields,* 261 F.Supp.2d at 975 (employees "received sales training in products and techniques"); *Krispy Kreme,* 346 F.Supp. at 1106 (employees underwent training program including reviewing the products to be sold; production and quality standards and methods; handling of the product; servicing of established customers; and training in increasing sales to established customers and gaining new business). Upon being hired by DeVry as field representatives, Plaintiffs spent the first month of their employment in training where they learned about DeVry's educational programs and services, as well as techniques for meeting prospective students, persuading them to submit an application, and the "stitching-in" method of following up on applicants to ensure they would start school at DeVry. In addition to this initial training, DeVry issued audio tapes and workbooks that instructed field representatives on methods for overcoming objections, territory management, booking the difficult high school, and finalization techniques. These facts reflect DeVry's efforts to train its field representatives in the art of sales.

■ An employee's compensation structure is another factor relevant to the determination of whether the employee is engaged in sales. Compensation based wholly or in significant part on commissions correlates with a finding that the employee does sales work. *See, e.g.,* *Fields,* 261 F.Supp.2d at 975 ("the majority of Plaintiffs' compensation came from sales commissions"); *Krispy Kreme,* 346 F.Supp. at 1104–5. However, the FLSA and DOL regulations do not require that an employee be paid a commission in order to be exempt as an outside salesperson. In fact, there is no compensation level or type requirement for the outside sales exemption. Salaried employees who received more modest commissions, incentives, or performance-based rewards have been found to be salespersons. *See, e.g., Hodgson v. Greene's Propane Gas Serv., Inc.,* 64 Lab. Cas. ¶ 32,455, 1971 WL 692 at *7 n. 8 (M.D.Ga. Feb.16, 1971) (employees found to be salespersons typically earned commissions ranging from 17% to 32% of their total salaries). Plaintiffs in this case were paid primarily in the form of a straight salary, but DeVry increased or decreased individual employees' salaries based on the achievement of performance objectives such as number of high schools booked, number of high schools lectured, number of students who completed surveys, number of personal and home interviews per week, average application interview rate, number of applicants tested, and by far most importantly, number of students who paid tuition and started classes at DeVry. In this way, DeVry's field representative salary structure, with its periodic upward or downward adjustments based primarily on number of student starts achieved, provided an implicit commission-like feature. In addition, approximately 10–20% of the top performing field representatives, measured again in terms of number of tuition-paying student starts, were rewarded with all expense paid, three day awards celebration at a resort hotel. Although these incentives differ from classic commissions, the field representatives' pay and rewards reflected to at least some degree their ability to accomplish what DeVry considers to be their most impor-

tant task and characterizes as the closing of the "sale": putting students into DeVry classrooms.

■ Independently soliciting new business is another indicator of sales activities. *Fields,* 261 F.Supp.2d at 975. Plaintiffs in this case were assigned territories, but within those territories they were responsible for generating the majority of their own leads. For example, field representatives independently contacted high schools to build relationships with guidance counselors and schedule student presentations. Field representatives also conducted career workshops, where they solicited information from students potentially interested in attending DeVry and got referrals. Using this information, they followed through with likely prospects, calling them on the telephone, meeting with them and their parents at home, encouraging them to submit applications, and "stitching them in" to ultimately attend DeVry. Whether or not Plaintiffs encountered new prospects depended largely on their own, independent efforts.

■ The nature and scope of an employee's supervision is another relevant factor. An employee who receives little or no direct or constant supervision in carrying out daily work tasks is more likely to be considered engaged in sales. In *Krispy Kreme,* 346 F.Supp. at 1104–6, the employees determined their starting time, work pattern, and number of hours. However, they were required to report to a supervisor on an almost daily basis and regularly meet with supervisors on a weekly or at least monthly basis. The court found the employees to be outside salespersons. Similarly, in *Fields,* 261 F.Supp.2d at 975, the employees were responsible for setting their own work schedule and for planning their work day activities. However, the employer trained and instructed the employees in sales techniques. Employees were expected to meet quotas, and those

who failed to do so were counseled. Again, the court found the employees to be outside salespersons. The levels of supervision in the aforementioned cases resemble DeVry's supervision of Plaintiffs. DeVry provided new employees with handbooks containing scripts for speaking with prospective students and detailing how to perform the job. DeVry also set various quotas and benchmarks and required detailed, regular reports. Nevertheless, Plaintiffs were for the most part on their own in planning their daily schedules and going about their tasks.

### (c) DOL Regulations: Making Sales or Obtaining Orders or Contracts for Services

Although the factors culled from the cases discussed above provide circumstantial indicia that Plaintiffs were salespersons, a more focused examination of the DOL's regulations strengthens the conclusion that Plaintiffs' activities comprised "making sales" or "obtaining orders or contracts for services." 29 C.F.R. § 541.501(a). The regulations illuminate the meaning of these phrases primarily by way of examples distinguishing between sales and sales promotion.

In one example, a manufacturer's representative visits retailers and does preliminary work, including "talking to the retailer for the purpose of getting him to place the order for the product," but the distributor's salesman who accompanies the manufacturer's representative is the one who has the authority to actually take the order. The manufacturer's representative is not performing sales work and is not exempt. 29 C.F.R. § 541.504(c)(2). In another example, a company representative visits stores to perform promotional work but does not complete the sale of the company's products. The company representative "fills out a requisition for the quantity wanted and leaves it with the store

manager to be transmitted to the central warehouse of the chainstore company which later ships the quantity requested." Here, "[s]ince the manufacturer's representative in this instance does not consummate the sale nor direct his efforts toward the consummation of a sale (the store manager often has no authority to buy) this work must be counted as non-exempt." 29 C.F.R. § 541.504(c)(4). In contrast, a route driver deliveryman who also "takes orders" or "obtains commitments" from customers for the products he delivers is an exempt outside salesperson. 29 C.F.R. § 541.505(d).

Another example in the regulations presents utility company representatives indirectly involved in "selling" by persuading the customer to purchase appliances which will result in a greater use of gas or electricity. 29 C.F.R. § 541.504(c)(3). Whether such an employee is exempt depends upon whether he "consummate[s] the sale or direct[s] his efforts toward making the sale himself." *Id.* An exempt outside salesperson is one who, "after persuading the customer to install a particular appliance may actually take the order for the appliance which is delivered from stock by his employer, or he may forward the order to an appliance dealer who then delivers it." This sort of activity is exempt sales activity, "since it is directed at the consummation of a specific sale by the utility representative, the employer actually making the delivery in the one case, while in the other the sale is consummated in the sense that the representative obtains an order or commitment from the customers." *Id.* In contrast, an employee is not engaged in exempt sales activities if he "persuades the consumer to buy the appliance and he may even accompany the consumer to an appliance store where the retailer shows the appliance and takes the order. In such instances the utility representative is not an outside salesman since he does not consummate the sale or direct his efforts toward making the sale himself." *Id.*

These examples from the regulations suggest that an employee is involved in exempt sales activities if he consummates a sale, directs his activities toward consummating a sale that he himself makes, or obtains orders or commitments from a purchaser. The regulations sum up the inquiry as follows:

In borderline cases the test is whether the person is actually engaged in activities directed toward the consummation of his own sales, at least to the extent of obtaining a commitment to buy from the person to whom he is selling. If his efforts are directed toward stimulating the sales of his company generally rather than the consummation of his own specific sales his activities are not exempt. Incidental promotional activities may be tested by whether they are "performed incidental to and in conjunction with the employee's own outside sales or solicitations" or whether they are incidental to sales which will be made by someone else.

29 C.F.R. § 541.504(b)(2).

Cases analyzing the outside salesperson exemption in light of the regulations provide further instruction regarding what constitutes sales activities. In one case, a soft drink bottler's routeman was not covered by the outside sales exemption because the routeman did not solicit orders and because the managers of stores that he visited lacked the authority to enter into binding sales agreements with the routeman. *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377, 383 (6th Cir.1970). In another case, however, "advance sales representatives and account managers" were found to have consummated the sales of Coca–Cola products at the stores that they visited. *Ackerman v. Coca–Cola Enters., Inc.*, 179 F.3d 1260 (10th Cir.1999). There was "no evidence in the record that sales

of Coca–Cola products at stores visited by the plaintiffs were made by any other Coca–Cola employees, and ... it was through their own transactions with personnel from stores carrying Coca–Cola products that sales were accomplished." *Id.* at 1266. The court concluded that the employees "thus resemble the exempt 'driver salesman' identified in 29 C.F.R. § 541.505(d), an employee who 'actually takes orders or obtains commitments from ... customers." In light of their authority to effect sales at the stores they visited, plaintiffs may be contrasted with the nonexempt manufacturer's representative discussed in 29 C.F.R. § 541.504(c)(4)—the one who 'does not consummate the sale nor direct his efforts toward the consummation of a sale." *Id.* Yet another court has determined that a real estate agent employed by a brokerage agency was engaged in sales activities because her work, "consisting of soliciting and making contracts for the sale of defendant's clients' property, falls within the definition of sales under the statute and regulations." *Luther v. Z. Wilson, Inc.*, 528 F.Supp. 1166, 1171 (S.D.Ohio 1981).

It is apparent from the regulations and cases mentioned above that the consummation of sales requires a measure of the capacity of two parties. The buyer, analogous to prospective DeVry students in the present case, must have the capacity to purchase or place an order for a product or service. There is no question that the prospective students purchased DeVry's services. The seller, analogous to Plaintiffs in the present case, must have the capacity to consummate sales, take orders, or obtain commitments from the buyer for the purchase of the employer's services. The question is whether DeVry field representatives had this capability. The Court concludes that they did.

As noted in the discussion of the DOL opinion letters, *supra*, DeVry automatically admitted students meeting its objective admissions criteria. Field representatives identified these students and shepherded them along the path to the classroom door. At one step toward the end of this path, applicants filled out an "enrollment agreement" containing a "notice to buyer (applicant)" stating that the agreement is a "legally binding instrument when signed by buyer and accepted by DeVry" and that "the buyer may cancel this agreement at any time prior to midnight of the fifth business day after the date of transaction." A space at the bottom of the agreement states "This Agreement accepted by DeVry University," with a box for "Representative's signature." It is not clear whether the signature box refers to field representatives, or some other DeVry personnel. What is clear, however, is that the field representatives performed the essential role in getting students to sign the enrollment agreement. The relationship between field representative and student ended only when the student paid tuition and started school—the latest point at which the transaction between DeVry and the student can be said to have been consummated. Given the scope of Plaintiffs' job, they plainly consummated sales, directed their efforts toward the consummation of sales, took orders, or obtained commitments. Therefore, DeVry has shown that Plaintiffs meet the requirements of the first element of the outside sales exemption.

### 2. Whether Plaintiffs' Work Was Outside

The second element of the "outside sales" exemption requires DeVry to prove that Plaintiffs "customarily and regularly" made sales "away from" DeVry's places of business. 29 C.F.R. § 541.500. For the reasons discussed below, the Court finds that Plaintiffs' work activities meet these requirements. Therefore,

DeVry has proved the second element of the "outside sales" exemption.

The regulations describe the meaning of "outside" or "away from his employer's place of business" as follows:

(a) Section 541.5 requires that an outside salesman be customarily and regularly engaged "away from his employer's place or places of business." This requirement is based on the obvious connotation of the word "outside" in the term "outside salesman." It would obviously lie beyond the scope of the Administrator's authority that "outside salesman" should be construed to include inside salesmen. Inside sales and other inside work (*except such as is directly in conjunction with and incidental to outside sales and solicitations*, as explained in paragraph (b) of this section) is nonexempt.

(b) Characteristically the outside salesman is one who makes his sales at his customer's place of business. This is the reverse of sales made by mail or telephone (except where the telephone is used merely as an adjunct to personal calls). *Thus any fixed site, whether home or office, used by a salesman as a headquarters or for telephonic solicitation of sales must be construed as one of his employer's places of business*, even though the employer is not in any formal sense the owner or tenant of the property. It should not be inferred from the foregoing that an outside salesman loses his exemption by displaying his samples in hotel sample rooms as he travels from city to city; these sample rooms should not be considered as his employer's places of business.

29 C.F.R. § 541.502 (emphasis added).

The regulations go on to explain the meaning of "incidental to and in conjunction with sales work" as follows:

Work performed "incidental to and in conjunction with the employee's own outside sales or solicitation" includes not only incidental deliveries and collections which are specifically mentioned in § 541.5(b), but also *any other work performed by the employee in furthering his own sales efforts*. Work performed incidental to and in conjunction with the employee's own outside sales or solicitations would include, among other things, the writing of his sales reports, the revision of his own catalog, the planning of his itinerary and attendance at sales conferences.

29 C.F.R. § 541.503 (emphasis added).

Here, Plaintiffs did not have offices on DeVry's premises. Instead, they worked either in the field, soliciting and meeting with students, or in their own home offices. In fact, DeVry mandated that field representatives maintain a home office, where they were provided with a computer, a phone line for online access, and an 800 number. As indicated in the regulations above, sales work done from a home office generally is considered nonexempt "inside" work. 29 C.F.R. § 541.502(b). However, home office work is not considered "inside" if done "incidental to and in conjunction with the employee's own outside sales or solicitation," which includes "any other work performed by the employee in furthering his own sales efforts."

The Court has already determined that Plaintiffs' work comprised sales activity. Plaintiffs did much of this work away from home, conducting events at high schools and meeting with students and their families at their homes. What Plaintiffs did from their home office furthered their own sales efforts, and was done incidental to and in conjunction with their outside solicitation and sales work. Therefore, Plaintiffs "customarily and regularly" performed their work "away from" DeVry's place of business, as required for the outside sales exemption.

### 3. Whether Plaintiffs' Work Activities Fall Within The 20 Percent Limitation

■ The third element of the "outside sales" exemption requires DeVry to prove that Plaintiffs' non-sales activities did not exceed 20 percent of the hours worked by DeVry's nonexempt employees. 29 C.F.R. § 541.500(b). For the reasons discussed below, the Court finds that Plaintiffs' work activities fall within the 20 percent limitation. Therefore, DeVry has proved the third element of the "outside sales" exemption.

The regulation setting forth the 20 percent limitation contains the following proviso: "work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt outside work." 29 C.F.R. § 541.500(b). The Court has already concluded that essentially *all* of Plaintiffs' work, whether at schools, students' homes, or in Plaintiffs' home offices, constituted outside sales or solicitations, or work incidental thereto or in conjunction therewith. In other words, Plaintiffs' non-sales activities were zero percent of their work. DeVry thus satisfies the 20 percent limitation element of the outside sales exemption.

### IV. *CONCLUSION*

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment because Plaintiffs are exempt from the FLSA's overtime pay requirements under the outside sales exemption. An Order consistent with this Opinion will be entered.